Hb6dauaa

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    AUA PRIVATE EQUITY PARTNERS,
      LLC,
 4
                    Plaintiff,              New York, N.Y.
 5
              v.                            17 Civ. 8035(GHW)
 6
      ASTRID SOTO,
 7
                    Defendant.
 8
      ------------------------------x
 9
                                            November 6, 2017
10                                          10:11 a.m.

11    Before:

12                    HON. GREGORY H. WOODS,

13                                          District Judge

14                         APPEARANCES

15
      SACK & SACK LLP
16         Attorneys for Plaintiff
      BY:  ERIC STERN
17         MICHAEL MUI

18    KAISER SAURBORN & MAIR, P.C.
           Attorneys for Defendant
19    BY:  DANIEL J. KAISER
           WILLIAM H. KAISER
20

21

22

23

24

25
```

Hb6dauaa

1          THE CLERK:  The Court calls the case of AUA Private

2     Equity Partners LLC versus Astrid Soto, case 17 Cv. 8035.

3          Counsel, please state your name for the record

4          MR. STERN:  Good morning, your Honor.  Eric Stern, and

5     to my left is Michael Mui, of the law firm of Sack & Sack, for

6     the plaintiff.

7          THE COURT:  Thank you very much.  Good morning.

8          MR. D. KAISER:  Good morning, your Honor.  Daniel

9     Kaiser, and to my left is William Kaiser, for the defendant

10    Astrid Soto.

11         THE COURT:  Good.  Thank you very much.  Good morning.

12         So we're here for a hearing with respect to

13    plaintiff's motion for a preliminary injunction.  I have

14    received the materials that the parties have submitted in

15    connection with this application and have reviewed them.

16         At the outset, let me ask counsel for plaintiff, are

17    you seeking to put on any testimony in addition to the factual

18    affidavits that you presented to the Court in connection with

19    the application?

20         MR. STERN:  Only if the Court needs to hear some

21    support for some of the backup evidence.  For example, in

22    Ms. Soto's affidavit she claims that she was not at work on

23    September 8th, 2017, one of the days that we allege that she

24    accessed her Google Drive.  We have over the weekend received a

25    copy of the security log that reads access when someone uses

Hb6dauaa

1    their pass code or pass key to access the building.  We have a

2    log that confirms that she indeed entered the building on

3    September 8, 2017.  If the Court requires somebody to

4    corroborate that or testify to that?

5           The other thing -- the other issues, I believe on the

6    papers Ms. Soto has not been able to demonstrate that she

7    should not be enjoined from using, having, disseminating, or

8    possessing any of that information.

9           THE COURT:  Thank you.  Let me ask the same question

10   of defendant.  Then I would like to highlight a couple of

11   issues that appear to be raised by defendant's submissions and

12   then we can discuss those issues.

13          Counsel for defendant, are you seeking to introduce

14   testimony in support of your defense of this injunctive relief?

15          MR. D. KAISER:  Your Honor, only -- I would echo only

16   if your Honor believes it would be useful.  Ms. Soto is in the

17   courtroom today for that purpose.  She is happy to provide any

18   sort of testimony in addition to her affidavit that would be

19   helpful to the Court.  If there are any unanswered questions by

20   her affidavit, for example, she is happy to provide that

21   information.  That's why she is here today.

22          I would just add very quickly, your Honor, with regard

23   to this issue of September 8th, her absolute memory was that

24   she was not in the office that day.  She in fact invited -- in

25   her affidavit said check with building security and they'll

Hb6dauaa

```
1    show that I wasn't in the building that day.  So that is her
2    memory.  I don't know what they are talking about in terms of,
3    you know, I guess it would have to be authenticated and
4    whatever, but I just want the Court to know that she put that
5    in there because that was her express memory.  And she in fact
6    invited them, which I guess they took her up on, to go check
7    with the building security.  So if you need to hear from her is
8    I guess my point on that issue, I'm happy to have her testify
9    to the Court, because there is certainly no -- you know, there
10   was no effort on her part to mislead anyone or to mislead the
11   Court.  That is her memory, that she was not there on that day.
12           THE COURT:  Thank you.  That's fine.  I don't expect
13   to focus on that particular issue.  I should note that
14   providing sworn testimony is a serious issue but not one that I
15   expect to focus on during today's hearing.
16           Counsel for plaintiff, there are a couple of factual
17   issues that defendant's submission raises.  First is the --
18   relates principally to Ms. Soto's asserted use of the
19   materials.  At the prior conference I had the understanding
20   that Ms. Soto had forwarded the materials to Ms. Kulaga --
21   whose name I did not have, to Ms. Kulaga, K-u-l-a-g-a --
22   outside of the term of Ms. Kulaga's employ.  What I take from
23   the parties submissions now is that the emails that bcc'd Ms.
24   Kulaga, which you are aware, were bcc'd to her during the term
25   of Ms. Kulaga's employ.  Do you have information about that?
```

Hb6dauaa

1          MR. STERN:  Yes, your Honor.  A couple of things.

2     First of all, we believe that notwithstanding the fact that

3     there was no reason for her to be sending out emails to

4     Ms. Kulaga that were also sent to her Gmail account, we believe

5     that Ms. Kulaga also received those emails on her Gmail

6     account, on her personal account, which is still a violation.

7          Second of all, there are certain emails that plaintiff

8     did not address in her affidavit.  And the overall

9     characterization of the plaintiff's affidavit is admission to

10    having and disseminating this information and that her

11    arguments regarding use of that information to preserve or to

12    make a claim for discrimination fail because there is no such

13    rule in New York.  The only case they cited was a Western

14    District of Texas.  And, second of all, most of the emails, and

15    certainly a significant number of the sensitive emails, were

16    sent prior to any of the allegations that she claims arose

17    regarding her discrimination, which I think she says happened

18    in 2017, and a lot of the emails were sent prior to that.

19          So I think that whether Ms. Kulaga received those

20    emails or whether it was during Ms. Kulaga's employment, they

21    still were sent to Ms. Kulaga's personal email, they still were

22    sent to Ms. Soto's personal Gmail, and she had no business

23    sending any of this information to herself or to Ms. Kulaga.

24          THE COURT:  Thank you.  Do I take it from that that

25    you have no evidence that Ms. Soto forwarded information to

Hb6dauaa

1    Ms. Kulaga at a time when Ms. Kulaga was not herself an

2    employee of AUA?

3              MR. STERN:  That's correct.

4              THE COURT:  Thank you.  Now, you've just made some

5    statements about the timing of certain of the submissions that

6    were sent to -- certain of the I'll call it confidential

7    submissions that were forwarded to the Gmail account.  In your

8    motion, you refer to two specific emails that contained what

9    you assert to be trade secrets.  Those are the April 6, 2016

10   email and the May 2, 2016 email.

11             Are there any other emails or other transmissions that

12   you point me to other than those in which -- or I should say

13   later than those in which Ms. Soto transmits trade secret

14   information?

15             MR. STERN:  Other than what was depicted or referenced

16   in our original motions, I don't believe there are additional

17   emails that we have -- that we are referencing.

18             I will point out that on page 12 of Ms. Soto's

19   affidavit, which is paragraph 45(IX)(4), she references a 2016

20   investor -- annual investor meeting, some of the detailed

21   information, but she denies sending it.  But we have

22   information that the information that she's referencing in her

23   affidavit actually was sent, and she does not at all

24   reference --

25             THE COURT:  That's the Master --

Hb6dauaa

| | |
|---|---|
| 1 | MR. STERN:  The Master Dashboard.  She does not |
| 2 | reference it as having it or sending it. |
| 3 | THE COURT:  Thank you.  I noticed that. |
| 4 | Are there later transmissions of trade secrets that |
| 5 | you would point me to of which there is evidence at this time? |
| 6 | MR. STERN:  When your Honor says -- |
| 7 | THE COURT:  Dated after May 2, 2016. |
| 8 | MR. STERN:  When your Honor references "trade |
| 9 | secrets," am I to presume that is there is a distinction |
| 10 | between that and confidential information? |
| 11 | THE COURT:  Yes, and I'll be very clear.  The only |
| 12 | basis for federal jurisdiction in this case is the Defend Trade |
| 13 | Secrets Act, which, as we discussed at our last conference, was |
| 14 | effective on May 11, 2016.  In your materials you have not |
| 15 | pointed me to any facts regarding transmissions of trade |
| 16 | secrets that happened after that date.  I inquired about it |
| 17 | during our prior conference, and you told me that there are a |
| 18 | number of transmissions, I think you said 40-odd emails. |
| 19 | Here I have additional information.  I'm not raising |
| 20 | it in a way that will lead to possible dismissal of the case |
| 21 | based on this colloquy, but I inquire because of the fact that |
| 22 | this is, as I understand it, the only basis for the Court's |
| 23 | subject matter jurisdiction in this case |
| 24 | MR. STERN:  I think that there are several emails sent |
| 25 | in March of 2017, April and August of 2017 that contain |

Hb6dauaa

1    information regarding customers, information regarding

2    investments, information regarding company product and company

3    secrets, regarding what the company is interested in investing,

4    what the company has been investing in.  I think that --

5          THE COURT:  Good.  That's fine.  And I will -- I may

6    ask for further inquiry by the parties on this question but I

7    just ask largely out of curiosity.

8          What is your argument, counsel for plaintiff,

9    regarding defendant's asserted use of these materials?

10   According to her affidavit, she concedes that she forwarded

11   information.  She does not specifically refute the assertion in

12   the Benyaminy affidavit regarding the Master Dashboard, but she

13   says that she hasn't used any of those materials for any

14   purpose.  What is your argument regarding how it is that she

15   has used those materials both for purposes of potential

16   violations of the federal and state trade secrets laws and

17   potential violations of her contractual obligations?

18         MR. STERN:  I think that there are inevitable

19   disclosure doctrines and provisions where she has information

20   that she shouldn't have and that having that information

21   improperly is in violation of those laws.  I think, more

22   importantly, is when you look at the balance of the equities

23   portion of an injunction, I think -- I can't see a single

24   reason that the equities should balance in her favor by having

25   this information.

Hb6dauaa

1          THE COURT:  Thank you.  So you're not making an

2     argument that you have a likelihood of success on the merits

3     with respect to use; instead you're saying your substantial

4     question and that the equities balance in your favor?

5          MR. STERN:  I think that the fact that she had that

6     information wrongfully, we can presume that it is going to be

7     used improperly.  Different than the cases that they've cited.

8     The cases that they've cited where injunctions were denied on

9     this very issue were regarding the successor corporations that

10     were being sued and dragged into the lawsuit, and there was no

11     proof in that case that the successor corporations received

12     that information.  For example, in the case that they cited,

13     Free Country LTD v. Drennen, and that is 235 F.Supp. 3d 559,

14     they cite that case for the proposition that a plaintiff could

15     not demonstrate that proprietary information was not used for

16     an improper purpose and was not likely to be improperly used,

17     that the DTSA was not violated and that plaintiff was not

18     entitled to preliminary injunction.  That's what they cite in

19     their papers, but in that case the individual defendants that

20     had already taken that information were already enjoined from

21     using it, and the only question in that case was whether or not

22     the successor corporation that they were going to join was

23     going -- they had not demonstrated that that successor

24     corporation had received that information.

25          But I think that when the former employee has that

Hb6dauaa

```
 1    information improperly and has no use for that information and

 2    that information has been breached by having that information

 3    and transferring it to her, we've already -- and for her to

 4    admit that she received that information and emailed it to

 5    herself, we've already succeeded on the merits in respect of

 6    the --

 7              THE COURT:  I'm sorry.  Why do you say that you've

 8    succeeded by the fact that she transferred it to herself?  Are

 9    you referring to the company policy document that prohibits

10    transmission of information --

11              MR. STERN:  Right.

12              THE COURT:  -- to emails other than the company's

13    email system?

14              MR. STERN:  She has an obligation to not have this

15    information, to not send it to herself, to not possess it, and

16    she indeed possesses it.  And to this point --

17              THE COURT:  Let me ask about that because it's not

18    clear what provisions of the contract that you're pointing to

19    in making that argument.  The contracts -- the offer letter

20    contains an agreement that the material is confidential and

21    proprietary, etc., and contains an agreement that the employee

22    will not "use such information for other reason other than to

23    further the business of AUA and its affiliates."  And that's

24    why I ask about what your argument is regarding the improper

25    use of these materials based on the facts that are in front of
```

Hb6dauaa

1    me.

2           MR. STERN:  Well, I think that the fact that she has

3    this information and there is no -- and it is of no use, I

4    think the Court can in this situation, for our ability to have

5    to prove that she already used this information is not the --

6    is not the test for us to receive an injunction from her to use

7    it or to have it.  She has it wrongfully and she has no use for

8    having that information.  The only use she would have for that

9    information is to improperly disclose it.  If she doesn't

10   destroy it or return it I think would be enough for this Court

11   to stop her from having it.  She has not demonstrated any use

12   or need for it, and I think that the fact that she hasn't used

13   it yet is not a test of whether or not we're entitled to stop

14   her from actually having it.

15          THE COURT:  Thank you, or using it.  I think those are

16   different questions.

17          Let me ask again about Ms. Kulaga.  We've talked about

18   the timing of the email to her and the question of whether she

19   was employed by AUA at the time.  Are you aware of any other

20   emails that copied non-AUA third parties other than the

21   defendant herself?

22          MR. STERN:  At this preliminary stage, we have not --

23   we have not conducted forensics studies and examinations on her

24   electronic devices.  So, this is all from a preliminary IT

25   attempt to discover what has been forwarded and left the

Hb6dauaa

1    company.

2           THE COURT:  Thank you.  Now, do you contend that by

3    forwarding emails to her personal account Ms. Soto was

4    conducting business?

5           MR. STERN:  We don't believe that there was any

6    legitimate business reason for her to have it.  The problem is

7    that after -- that argument is defeated by the fact that she

8    hasn't returned it or made efforts to destroy it.  Instead, she

9    has refused to do so and here we are.

10          THE COURT:  Thank you.  Good.

11          Now, with respect to the trade secret argument, what

12   is it, what is the basis for your argument that she improperly

13   used the trade secret?  Is it an agreement?  Is it a

14   confidential duty or relationship?  What is it specifically

15   that she's breached or violated that gives rise to a state

16   trade secret claim?

17          MR. STERN:  AUA has, as your Honor has seen,

18   contractual agreements as well as policies, compliance and

19   employee policies, that prevent the dissemination of

20   confidential information and trade secret information from

21   being disseminated by the employees.  We take tremendous care

22   in ensuring that each of the employees sign these policies and

23   are aware of these policies.  Ms. Soto in her capacity was

24   aware of the impropriety of sending information to herself.  I

25   think that the Master Dashboard is exactly the type of trade

Hb6dauaa

```
1    secret and client information that can substantially injure the
2    firm.  It contains investment opportunities, investor lists,
3    contact information, deal information that the firm has put
4    together through its own resources that is not publicly
5    available by either Ms. Soto or anyone else unless you are in
6    that seat.  And the firm has taken tremendous care and
7    responsibility in preventing the disclosure and dissemination
8    of that information.  So both from a policy definition and from
9    a common law definition of trade secrets, this information is
10   protected, and the company has demonstrated that it seeks to
11   have that information protected.  And the defendant has not
12   established a reason why that information would not be trade
13   secret, and she also has not established a reason why she has a
14   right to have that information and that the dissemination of
15   that information that she has -- and she's already demonstrated
16   that she's sent other emails out to other people -- that that
17   would irreparably harm the company.
18            THE COURT:  Thank you.
19            Let me turn to counsel for defendant.  Is there
20   anything that you would like to say in response?  And then I
21   have a series of questions for you as well.
22            MR. D. KAISER:  Sure.  First, your Honor, factually,
23   with respect to Ms. Kulaga, because I think that that was the
24   centerpiece of their presentation to your Honor in terms of her
25   forwarding information -- misusing information by forwarding it
```

14

Hb6dauaa

1    to a nonparty, someone who was a former CFO to make the

2    suggestion that she had done that, had forwarded it, you know,

3    beyond the strictures of her employment period.

4           She did not forward any business information of any

5    kind to Ms. Kulaga following Ms. Kulaga's departure.  The only

6    information she forwarded to Ms. Kulaga was during Ms. Kulaga's

7    employment, and that was to Ms. Kulaga's AUA email account.

8    Now, I don't know what the evidence is that it went to

9    Ms. Kulaga's private email.  I don't know why she would have

10   any reason to do that.  I don't know whether Ms. Kulaga

11   forwarded it to her own personal email account.  But I want to

12   make that very clear, because that is a central factual

13   allegation and contention.

14          She did not forward any information to Ms. Kulaga

15   other than during the course of Ms. Kulaga's business and other

16   than to her email account, meaning Ms. Kulaga's email account.

17   So there was nothing improper about how she handled information

18   with respect to Ms. Kulaga.

19          Further factually, she did not forward any information

20   to any third party at any time other than during the course of

21   her employment, in the course of doing her duties.  I mean,

22   obviously she was dealing with clients and business and

23   obviously you exchange information back and forth with third

24   parties, but she did not forward any information to any third

25   parties improperly at any time.  And there is no evidence to

Hb6dauaa

1    the contrary -- none.

2            As far as her forwarding emails, there being no

3    business purpose for forwarding emails to herself, meaning her

4    Gmail account, there was one period of time -- and, in fact,

5    they disingenuously used this example in their moving papers --

6    before she started, meaning before the commencement of her AUA

7    employment, there was a period of time where she was ramping up

8    and beginning to work for them but she was using a private

9    email account to do that before she got there.  And they knew

10   that.  They sent emails to her, to her Gmail account, in order

11   to work with her in the runup period to the commencement of her

12   employment.  And yet they use that as an example to this Court

13   as her -- as one of her misdeeds.

14           So in fact there were business reasons for using Gmail

15   accounts.  There was nothing -- she wasn't using it as a

16   vehicle to disseminate information improperly.  It might have

17   been convenient in one circumstance or another.  We have in

18   court today, your Honor, an example of an email that was

19   forwarded to -- another AUA employee forwarding an email to

20   their own Gmail account that they then forwarded over to

21   Ms. Soto.  So there was nothing improper about any of this

22   conduct.

23           The emails themselves -- and we've taken the time to

24   create a book with those emails, your Honor, so your Honor

25   could see them for himself and you could also look at.  And

Hb6dauaa

1    while she was at it, whatever other emails she could find that

2    went to her Gmail account, and just in the spirit of complete

3    disclosure, we've also included those, meaning others that they

4    didn't even identify that she could find that she forwarded to

5    herself.  There is nothing confidential about this stuff.

6              The NDA that they talk about as being a trade secret,

7    it is a form NDA that a client signed.  There was no trade

8    secrets.  There was no proprietary information.

9              And as far as the Defend Trade Secrets Act, your

10   Honor, it is in fact the case that they have to demonstrate

11   that there was an improper use or -- or -- that it is highly

12   likely that there will be an improper use of this material, you

13   know, but for the extraordinary intervention of a court.  And

14   at this preliminary stage they have to demonstrate that by

15   clear and convincing evidence in order to get this

16   extraordinary relief that they are seeking.

17             And there hasn't been any sharing of that information

18   with a third party, uncontested, and there is absolutely no

19   circumstances here that would suggest that Ms. Soto is about to

20   run off and use the information or share it with anyone else.

21   There is no indicia of that that the Court could rely upon that

22   this is a risk in this particular case that Ms. Soto would do

23   that.  There was nothing other than the complete innocent doing

24   of business even if, you know, the forwarding of this

25   occasional email to her private email account was something

Hb6dauaa

1    that was -- it violated their internal rules.

2         I would say to that, your Honor, though, that as she

3    notes in her declaration, they had rules that stated that AUA

4    periodically monitors the use of email of their employees, you

5    know, regularly looks at this in order to assure themselves

6    that there is compliance.  I mean, she was there for years.  No

7    one ever came to her and said, oh, by the way, you know that

8    little -- that publication that you forwarded to client A, you

9    used your Gmail account.  Don't do that in the future.  Just

10   make sure you are very strict about using the AUA work email

11   account.  No one ever said that to her.  This only became an

12   issue after I sent a detailed letter to them outlining a gender

13   claim, and then they came to this Court seeking this

14   extraordinary relief.

15        The fact of the matter is at the end of the day, when

16   all is said and done, she hasn't shared it with anyone.  There

17   is no reason to be concerned that she's going to share it with

18   anyone.  There would be occasional using of a Gmail account for

19   business reasons that they never previously challenged her on.

20   And she never gave it to anybody.  And their grand example of

21   Ms. Kulaga turns out, as counsel now is forced to concede, you

22   know, there is no evidence that she's done anything improper

23   with a third party or shared it with third parties or anything

24   like that.

25        So, you know, just in sum, your Honor, I think that at

Hb6dauaa

1    the end of the day, no proprietary information, even the stuff

2    that went to her Gmail account, and, in any event, nothing that

3    was shared with anyone and no risk, of the facts now presented,

4    that she is going to share it with anyone.  So --

5              THE COURT:  Thank you.  Let me ask you about the

6    materials that were described as having been sent by Ms. Soto

7    in the plaintiff's affidavit.  They include a reference to the

8    May 2, 2016 email that contained the Master Dashboard

9    spreadsheet which I believe to be the Holy Grail document that

10   counsel described to me at our last conference.  That specific

11   email and document wasn't addressed in Ms. Soto's affidavit.

12   Do you have information about that?

13             MR. D. KAISER:  I don't, your Honor, but Ms. Soto does

14   and she is here.  That's why I brought her.  She is happy to be

15   sworn in and talk to you directly about that email.

16             THE COURT:  Thank you.  If I were to allow you to call

17   her to provide testimony on that, it would open her up to

18   cross-examination by counsel for plaintiff.  So I would let you

19   think about whether this is a fact on which you want to present

20   me with contradictory evidence to the evidence that is before

21   me now, which is that Ms. Soto bcc'd -- sorry, sent to her

22   personal account an email with the Master Dashboard

23   spreadsheet.

24             Can I ask a separate question while you are thinking

25   about that?  Do you have any issue with the current injunction?

Hb6dauaa

```
 1    In other words, does Ms. Soto want to have the right to use any
 2    of these materials for any purpose?
 3            MR. D. KAISER:  No, your Honor, other than -- other
 4    than for litigation purpose, you know, in the context of a
 5    separate litigation that may be coming, to the extent it is
 6    relevant, but that would be subject to confidentiality
 7    stipulations and the like.  So the answer, generally speaking,
 8    of course not.  No, absolutely not.
 9            THE COURT:  Thank you.  So it does raise the question,
10    then, of whether this set of issues, taking apart the asserted
11    potential employment discrimination related claims, which are
12    not before me, is whether or not the issues that are before me
13    here, namely, the plaintiff's request that Ms. Soto return the
14    records to them and agree not to use them, is something that
15    can be resolved without expensive time-consuming litigation
16    given that, as I understand it, Ms. Soto agrees that she will
17    not use the materials and will not be disclosing them to other
18    persons.  Given that, it is not clear to me why, apart from
19    wanting to make sure that the documents are not destroyed in
20    the interim, they wouldn't be capable of being returned to the
21    plaintiffs to retain in their possession.
22            MR. D. KAISER:  The answer, your Honor, is there is no
23    reason for it.  I offered that to defendants.
24            I'd like, so that in the spirit of expensive
25    litigation, as your Honor just described it, that we can do
```

Hb6dauaa

1   this in the context of a stipulation of discontinuance, if

2   that's the relief that they are seeking, so that we are not in

3   this court defending this case beyond those issues.  So, yes, I

4   mean, I'm happy to return the documents.  She has already

5   represented that she is not going to use them.  And, in fact, I

6   believe Ms. Soto feels that she has an obligation to do that

7   whether the Court tells her to do that or not.  And she never

8   had any intention of violating those obligations.

9              So, yes, she won't use them.  Yes, I'm happy to return

10  what she has as long as, your Honor, we can catalog what I'm

11  returning so in the event that in a separate litigation I seek

12  discovery of that information, I have some record of what

13  actually was returned.

14             THE COURT:  Thank you.

15             Counsel for plaintiff, any response?

16             MR. STERN:  Yes.  First of all, this whole thing about

17  preservation of emails for a potential claim, counsel made that

18  argument at the last hearing --

19             THE COURT:  I'm hearing something different here.

20  Just to be clear, the argument made in their papers, namely,

21  that it's a proper use to take documents in connection with

22  potential future litigation, is not one that I understand them

23  to be raising here.  Rather, the suggestion, as I hear it, is

24  that he wants to make sure that if the documents are returned,

25  they are not inadvertently destroyed.

Hb6dauaa

1              MR. STERN:  I heard differently.  I heard something to

2       the respect of we're going to catalog these emails and the

3       emails that he's going to want to use.  Those emails, we are

4       not going to destroy any of those emails and we are happy to

5       catalog what he returns.

6              One of the issues we're going to have is discontinuing

7       this matter.  Keeping the status quo I think is something that

8       we can agree to, that she is not going to use it and that the

9       information is going to be returned.  I think the fear is we

10      need to have some comfort in that this information has not gone

11      anywhere else.

12             My experience in this court, in a case that we are

13      dealing with right now, is that oftentimes can be alleviated by

14      a third-party vendor doing a search on someone's electronic

15      devices to ensure that that information, that no side has

16      access to this information, to her personal information, and

17      that the information is indeed destroyed or returned back to us

18      in full compliance.  So while we're willing to do that, we want

19      to be able to ensure ourselves that they weren't forwarded to

20      any other email accounts and that indeed we've received back

21      all of the information.

22             So I think it's consistent with what counsel was

23      suggesting.  We're just suggesting that we, in order for us to

24      I guess discontinue this matter or to have a full resolution,

25      we need to have full comfort that the information is returned

Hb6dauaa

1    and that no other information has been disseminated, or that

2    information has not been disseminated to any third parties.

3         THE COURT:  Thank you.  Is plaintiff -- and I just ask

4    out of curiosity, not because I have a view.  Is plaintiff

5    willing to take on the cost of such a third-party forensic

6    examination?

7         MR. STERN:  I have not discussed it with my clients,

8    but I will.

9         THE COURT:  Thank you.

10        Good.  I would strongly encourage that conversation.

11   Basically, as I understand the delta between what plaintiffs

12   want and what defendants are willing to do without the cost of

13   litigation is just that forensic examination.  Otherwise,

14   plaintiff is agreeing to -- or is willing to hand over the

15   documents with a catalog.  Presumably, there is a litigation

16   hold of some sort in place at plaintiff so that the records

17   would not be destroyed so the risk of their improperly being

18   destroyed is limited.  But I can understand defendant's desire

19   to have some prophylactic in place in the event that if the

20   unexpected were to occur.

21        So basically the delta between where the parties are

22   is whether or not there is a forensic examination of Ms. Soto's

23   phone, presumably, and computer, and litigation is a costly

24   way, perhaps, to obtain that.  But in any event, I hope the

25   parties will discuss that possibility of resolving the matter

Hb6dauaa

```
1    as a whole, because, very simply, I appreciate that there is an
2    overlay of the potential discrimination claim but that's not
3    before me.  Before me is the set of trade secrets claims and
4    breach of contract claims that led to this request for
5    injunctive relief.
6            Is there any other argument with respect to the
7    requested preliminary injunctive relief?  If not, I would
8    expect to take a few moments to contemplate my decision and
9    then come back and rule.
10           Counsel?
11           MR. STERN:  Only that just to reply briefly to what
12   counsel said.
13           THE COURT:  Take your time.
14           MR. STERN:  I think that the fact that this Court has
15   broad discretion to grant this injunctive relief, coupled with
16   the fact that since defendant has not articulated a single
17   reason why they should have this information and why she wants
18   to have this information, it's highly likely that there will be
19   an improper use can be presumed by this Court, considering that
20   there is no reason for her to have this information.  Now that
21   she's been willing to return this information, therefore, I
22   think that the temporary injunction that was put into place I
23   think on or around October 23rd should remain in place until
24   either there is going to be resolution or until we start
25   commencing otherwise litigation on this matter.
```

Hb6dauaa

```
1          THE COURT:  Thank you.  And are you still requesting,

2     counsel, the broader mandatory injunction that you requested in

3     your papers?

4          MR. STERN:  I'm sorry.

5          THE COURT:  Are you requesting the broader mandatory

6     injunction that you requested in your papers; namely, in

7     addition to enjoining the defendant from using these materials,

8     the request that I order that she return them to plaintiffs and

9     that she permit the forensic examination that you have

10    suggested?

11         MR. STERN:  Yes.  I think that that would be

12    appropriate, considering that the defendant has not articulated

13    a reason why she should have this information, that there is a

14    highly -- there is a high likelihood that she will use this

15    information for improper use, if she's not going to return it.

16    I believe that rather than inclusive of electronic devices, I

17    think more importantly is that the email -- her Gmail account

18    be searched or that any information residing on her Gmail

19    account in the cloud be returned.  I know from personal

20    experience my personal laptop, if I were to lose it tomorrow, I

21    would turn on a new laptop and my email accounts and my

22    documents all come back onto a cloud.  So I think it is a

23    little bit less about what is actually on -- it is not only

24    about what's on her electronic device, but if there is

25    information that's residing in a Gmail account, for example,
```

Hb6dauaa

1    that's residing in a cloud, that is really the source of where

2    any confidential information should be returned and/or deleted.

3           THE COURT:  Thank you.  I understand that.

4           As the parties are talking about alternatives, I'll

5    just remind you of the possibility of requesting that the Court

6    enter some sort of consent judgment with permanent injunctive

7    relief with respect to the dissemination of these materials.

8           Counsel for defendant, is there anything that you

9    would like to add?

10          MR. D. KAISER:  No.  I mean, just very briefly, your

11   Honor.

12          The remedies that they are seeking, as I think I've

13   already articulated, are highly intrusive remedies.  I think

14   there has to be a legal basis, a factual basis in law for them,

15   not simply that it would be nice to have and nice to have these

16   prophylactic remedies.  There are standards that have to be

17   met.  They have to prove by clear and convincing evidence that

18   she has used or will use this information.  They have not done

19   so.  Prove that she's actually engaged in misconduct by using

20   it for her own benefit or disseminating it to third parties.

21   They have not met that burden.

22          And there is no reason to believe that Ms. Soto, based

23   on what we know, won't respect the confidentiality of the

24   information.  So asking for us for a consent decree is one

25   thing, and we certainly will talk about that, as your Honor

Hb6dauaa

suggested and as I've already stated I'm willing to do on

certain things, but having the Court order some of these things

based on this record, I don't think that it is there, your

Honor.

THE COURT:  Good.  Thank you very much.

I will be back momentarily after I have considered

your arguments.  Thank you.

THE CLERK:  All rise.

(Recess)

THE COURT:  So, thank you very much, counsel, for your

patience while I considered your arguments.

First, thank you very much for all of your arguments

in your presentations.  I appreciated them and your

submissions.

I'm going to grant in part plaintiff's motion for

preliminary injunction.  I am going to deny the request that I

impose mandatory injunctive relief on defendant.  I'm going to

review in part my analysis of the question now.  So, please

bear with me as I read you some introductory remarks, then the

legal standard.  Then I expect to discuss the misappropriation

of trade secrets claim under New York law, all in the presence

of irreparable harm, all of which an analysis of which has led

me to the conclusion that there are sufficiently serious

questions going to the merits with respect to the state law

trade secrets claim and the balance of hardships that tips in

Hb6dauaa

1   favor -- the movant's favor and also supports the existence of

2   irreparable harm, but first let me provide some introductory

3   remarks.

4         As the parties know, defendant Astrid Soto was

5   employed by plaintiff, AUA Private Equity Partners, LLC as Vice

6   President of Business Development and Investor Relations from

7   about March 31, 2014 to September 11, 2017.  In connection with

8   her employment, Ms. Soto signed three documents that are at

9   issue in this case.  First, on March 10, 2014, she executed an

10  Offer Letter that provided, among other things, the following:

11        "By accepting employment with AUA, you understand and

12  agree that you will be privy to certain confidential and

13  proprietary information regarding transactions, investors and

14  other valuable financial and other information regarding the

15  firm and its employees.  In consideration of employment and

16  access to such confidential information, you agree that you

17  will not during or after your employment with AUA use such

18  information for any reason other than to further the business

19  of AUA and its affiliates."

20        Second, on September 8, 2015, Ms. Soto signed a

21  confidentiality acknowledgment with respect to the Employee

22  Policies and Procedures Handbook, which stated:

23        "I agree to maintain the confidentiality of any

24  information concerning the Firm which is furnished to me by the

25  Firm, together with analyses, compilations, studies or other

Hb6dauaa

documents and records prepared by me, in a manner consistent

with the confidentiality obligations detailed in the Policies

and Procedures ... I agreed to abide by the rules, obligations,

duties, policies and standards set forth with respect to

confidential information in the Policies and Procedures."

AUA's Policies and Procedures states, among other

things:

The Firm's confidential information and intellectual

property, including trade secrets, are extremely valuable to

the Firm.  You must treat them accordingly and not jeopardize

them through your use of your device.  Disclosure of Firm's

confidential information to anyone outside the Firm and use of

the Firm's intellectual property for matters unrelated to the

Firm's business is prohibited."

Finally, on February 25, 2017, Ms. Soto executed an

"Employee Acknowledgment of Receipt" of the AUA Supervisory

Procedures and Compliance Manual.  That manual sets forth AUA's

email retention policy, which directed employees to "refrain

from conducting business through any communications network not

maintained by the investment adviser."  I emphasize here that

the document that she signed was a "acknowledgment of receipt"

of that manual.

During the course of her employment, Ms. Soto was

given access to confidential and proprietary information

relating to AUA's business, including confidential internal

Hb6dauaa

1    strategic information, confidential investor information, and

2    confidential business information.  Ms. Soto also possessed

3    investor reports, investor contact information, investor

4    commitment amounts, and other proprietary and confidential

5    documents and information that AUA alleges constitute the

6    business's trade secrets.

7            Ms. Soto was terminated from her employment on

8    September 11, 2017.  As I said earlier, AUA alleges that

9    between early 2014 and her termination, Ms. Soto

10   misappropriated confidential and proprietary information by

11   forwarding emails from her AUA email account to her personal

12   email address and by copying a former AUA employee, who the

13   complaint asserts is believed to work for a competitor of AUA

14   on some of those emails.  As we established during today's

15   conference, however, the former AUA is currently a former AUA

16   employee but she was not a former AUA at the time that the

17   emails were forwarded to her.  Instead, she was a then current

18   employee.  AUA also alleges that Ms. Soto uploaded proprietary

19   AUA files from her work laptop to her personal Google drive

20   account.  According to AUA, many of the emails and other files

21   that remain in Ms. Soto's possession contain sensitive and

22   confidential information owned and controlled by AUA.

23           On October 23, 2017, I granted AUA's request for a

24   temporary restraining order.  That restraining order expires

25   today.

Hb6dauaa

1    As I stated earlier during today's proceedings, among

2 the facts that were not clear to the Court at the time is that

3 Ms. Kulaga was at the time of the emails forwarding to her then

4 an AUA employee.

5    AUA now moves for an order:  (1) prohibiting Ms. Soto

6 from possessing, disclosing, reviewing, and actual or

7 threatened use and/or misappropriation of AUA's confidential

8 information, trade secrets, documents or data; (2) requiring

9 the immediate return to AUA of any and all of its confidential

10 information and property; (3) appropriate assurances to ensure

11 compliance with the Court's order; (4) requiring Ms. Soto and

12 her counsel to certify to the Court that they have permanently

13 deleted any and all AUA confidential information from her

14 devices: (5) awarding AUA attorneys' fees and costs in bringing

15 this motion; and (6) such other relief as the Court deems just

16 and proper.

17    First, as I have noted during the course of the

18 conference, while I appreciate the information that the

19 defendant and the parties have provided with respect to

20 Ms. Soto's potential employment discrimination claim, that

21 information provides some context, but I'm only considering the

22 matter that's before the Court, namely, AUA's motion for

23 preliminary injunctive relief in connection with an asserted

24 breach of contract and breach of trade secrets claims.

25    Now, the legal standards governing preliminary

Hb6dauaa

1    injunctions and temporary restraining orders in the Second

2    Circuit are the same.  See, e.g., Local 1814, International

3    Longshoremen's Association v. New York Shipping Association,

4    Inc., 965 F.2d 1224, 1228 through 1229 (2d Cir. 1992).  A

5    preliminary injunction "is an extraordinary and drastic remedy,

6    one that should not be granted unless the movant by a clear

7    showing carries the burden of persuasion." Grand River

8    Enterprise Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir.

9    2007) (per curiam) (internal quotation marks omitted).

10            Generally, a party seeking a preliminary injunction

11   must demonstrate:  "(1) either (a) a likelihood of success on

12   the merits or (b) sufficiently serious questions going to the

13   merits to make them a fair ground for litigation and a balance

14   of hardships tipping decidedly in the movant's favors, and (2)

15   irreparable harm in the absence of the injunction." Faiveley

16   Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 116 (2d Cir.

17   2009) (citation and internal quotation marks omitted).

18   However, "the burden is even higher" when a party seeks "a

19   mandatory preliminary injunction that alters the status quo by

20   commanding some positive act, as opposed to a prohibitory

21   injunction seeking only to maintain the status quo." Cacchillo

22   v. Insmed, 638 F.3d 401, 406 (2d Cir. 2011) (quoting Citigroup

23   Global Markets, Inc. v. VCG Special Opportunities Master Fund

24   Ltd., 598 F.3d 30, 35 N. 4 (2d Cir. 2010).  To meet that higher

25   burden, a party seeking a mandatory injunction must show a

Hb6dauaa

1    "clear or substantial likelihood of success on the merits."

2    Doninger v. Neihoff, 527 F.3d 41, 47 (2d Cir. 2008) (internal

3    quotations and citations omitted).

4         Here, AUA's seeks an order that not only prohibits

5    Ms. Soto from possessing, disclosing, reviewing, or using AUA's

6    confidential information and trade secrets, but that also

7    imposes certain affirmative obligations on Ms. Soto.

8    Therefore, in order to secure all of the relief requested, AUA

9    must meet the more stringent mandatory injunction standard and

10   show a substantial likelihood of success on the merits in

11   addition to irreparable harm.

12        Now, plaintiff has alleged causes of action for

13   violations of the Defend Trade Secrets Act of 2016, breach of

14   contract, and misappropriation of trade secrets under New York

15   law.  And for the sake of efficiency for the parties and their

16   time, I'm not going to run through my analysis of all of those

17   causes of action now.  Instead, I'm going to focus in

18   particular on the claim with respect to a misappropriation of

19   trade secrets under New York law.  And I believe, as I said

20   earlier, that the plaintiff has demonstrated sufficiently

21   serious questions going to the merits to make them a fair

22   ground for litigation, a balance of hardships tipping decidedly

23   in movant's favor.

24        I am not finding a likelihood of success on the merits

25   or a substantial likelihood of success on the merits on the

1    record before me, given the lack of clear evidence regarding

2    improper use of the materials at this time.  However, I believe

3    that there is sufficient evidence to justify a finding that

4    there are substantially sufficiently serious questions going to

5    the merits to make it a fair grounds for litigation.

6            To succeed on a claim for the misappropriation of

7    trade secrets under New York law, a party must demonstrate:

8    "(1) that it possessed a trade secret, and (2) that the

9    defendants used that trade secret in breach of an agreement,

10   confidential relationship or duty, or as a result of discovery

11   by improper means."   North Atlantic Instruments, Inc. v.

12   Haber, 188 F.3d 38, 43-44 (2d Cir. 1999) (citing Hudson Hotels

13   Corp. v. Choice Hotels International, 995 F.2d 1173, 1176 (2d

14   Cir. 1993).

15           First, with respect to the existence of a trade

16   secret, I'll simply say:  "A trade secret is 'any formula,

17   pattern, device or compilation of information which is used in

18   one's business and which gives [the owner] an opportunity to

19   obtain an advantage over competitors who do not know or use

20   it.'"   Id. at 44 (quoting Softel, Inc. v. Dragon Medical &

21   Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir.

22   1997))  "In determining whether information constitutes a trade

23   secret, New York courts have considered the following factors:

24   (1) the extent to which the information is known outside the

25   business; (2) the extent to which it is known by employees and

Hb6dauaa

others involved in the business; (3) the extent of measures

taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and its

competitors; (5) the amount of effort or money expended by the

business in developing the information; (6) the ease or

difficulty with which the information could properly be

acquired or duplicated by others." Id. (Internal quotations

and citations omitted.)

"A customer list developed by a business through

substantial effort and kept in confidence may be treated as a

trade secret and protected at the owner's instance against

disclosure to a competitor, provided the information it

contained is not otherwise readily ascertainable." Defiance

Button Machine Co. v.  C & C Metal Products Corp., 759 F.2d

1053, 1063 (2d Cir.) (Internal quotations and citations

omitted).

Here, the Master Dashboard and investor list described

by AUA is likely to be found to constitute a trade secret under

New York law.  The information is disclosed to a "small and

exclusive group of investment and other professionals within

the company" and is therefore not likely to be known outside of

AUA.  The information is highly confidential and includes

internal strategic information, prospective investor lists, and

potential and actual business opportunities.  AUA has taken

various security measures to ensure the protection of its

Hb6dauaa

1    information, likely making it difficult for others to properly

2    acquire or duplicate the information.  Therefore, the factors

3    articulated by the Court in <u>North Atlantic Instruments</u> weigh in

4    favor of finding the existence of a trade secret with respect

5    to that information.

6         Now, I believe that a sufficient substantial question

7    related to the merits of the issue has been raised, although

8    there are some questions regarding the scope and extent of the

9    use by Ms. Soto of the trade secret, but I think that that's a

10   question that is fair ground for litigation here.  And, in

11   terms of the balance of the hardships, they clearly tilt

12   strongly in favor of the plaintiffs here.

13        Ms. Soto has no use for this information.  She asserts

14   that she has no expectation of using it or disclosing it to any

15   person.  So, the balance of hardships by imposing this

16   injunctive relief as requested tilts strongly in favor of the

17   plaintiff, and there seems to be no counterbalancing factor on

18   the side of the ledger on account of Ms. Soto.

19        With respect to irreparable harm, "The showing of

20   irreparable harm is the single most important prerequisite for

21   the issuance of a preliminary injunction."  <u>Grand River</u>

22   <u>Enterprise</u>, 481 F.3d at 66 (internal quotation marks and

23   citations omitted).  The Second Circuit has defined

24   "irreparable harm" as "certain and imminent harm for which a

25   monetary award does not adequately compensate."  <u>Wisdom Import</u>

Hb6dauaa

1    Sales Co., LLC v. Labatt Brewing Co., Ltd., 339 F.3d 101, 113.

2    In other words, "where money damages are adequate compensation

3    a preliminary injunction should not issue." JSG Trading Grp.

4    v. Tray-Wrap Inc., 917 F.2d 7579.

5         As described during our prior conference, irreparable

6    harm is presumed where a trade secret has been misappropriated

7    because "As the Court of Appeals for the Second Circuit has

8    explained, a trade secret once lost is lost forever." Estee

9    Lauder Companies, Inc. v. Batra, 430 F.Supp.2d. (S.D.N.Y.

10   2006).

11        Now, here, because a trade secret has been allegedly

12   misappropriated, irreparable harm is presumed.  Nonetheless, I

13   can conclude that AUA has also sufficiently demonstrated that

14   it will suffer the following in the absence of injunction:  The

15   possibility of loss of consumer relationships or goodwill, loss

16   of competitive position in the industry and other competitive

17   harm for AUA for which monetary damages would not be

18   appropriate in the event that Ms. Soto further disseminates or

19   permits to be disclosed the information that she has taken.

20        So, I'm going to grant the requested relief in part.

21   I am going to continue the existing TRO in accordance with its

22   current terms.  I am denying, however, the requested mandatory

23   injunction because I can't conclude on this record that the

24   plaintiffs made a sufficient showing to justify the entry of a

25   mandatory injunction.

Hb6dauaa

1      So, I'll issue a separate order that continues the

2 current injunction as we continue to litigate the case.

3      So, just a few moments -- a few comments, rather,

4 before we adjourn and I'd like to hear from the parties

5 regarding your views on next step.

6      I raise the question with respect to jurisdiction.  At

7 this point, I'm working with the plaintiff's prima facie

8 showing on the basis of the complaint.  There, as the parties

9 know, I am a court of limited jurisdiction.  If it turns out

10 that there is no claim under the federal statute because there

11 has been no use, disclosure or use of a trade secret within the

12 time period after the effective date of the Trade Secrets Act,

13 then I might be left with no jurisdiction in the case.  I would

14 invite the parties to consider that issue, and if there is a

15 motion to be brought, to let me know about it.  I have some

16 concern, as the parties will appreciate, that we may go far

17 down the road in this case only to discover that there is no

18 basis for the case to be here and so I raise the issue, as I

19 did during our colloquy earlier.

20      Second, to the extent that the parties have the

21 opportunity to talk about an amicable resolution of this case,

22 I would encourage it.  The mandatory relief that plaintiff is

23 seeking, that I have been unable to grant as a matter of law

24 based on the record before me, is something that defendant is

25 volunteering for free for all purposes other than the forensic

Hb6dauaa

1    examination, and it's for the parties to determine whether a

2    more efficient resolution of that issue can be found through

3    means other than litigation.

4              So long as the case is pending before me, I'm going to

5    have the parties working.  So my expectation is that my next

6    step in the case will be to issue an initial pretrial

7    conference order, have the parties here, set a discovery

8    schedule, and to begin litigation of these issues in full in

9    this case in this court, and from that we'll determine what the

10   appropriate remedies are.

11             Is there anything else that we should discuss.

12   Counsel for plaintiff?

13             MR. STERN:  Nothing further, your Honor.

14             THE COURT:  Thank you.

15             Counsel for defendant?

16             MR. D. KAISER:  Nothing further, your Honor.

17             THE COURT:  Good.  Thank you, all.

18             This proceeding is adjourned.

19

20                              -   -   -

21

22

23

24

25